The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Willis and upon the briefs and argument of counsel. The appealing party has shown good ground to reconsider the evidence. The Full Commission reverses the Deputy Commissioner's Opinion and Award and enters the following Opinion and Award.
At the hearing on 8 June 1995, the parties submitted a Pre-Trial Agreement, dated 8 June 1995. This document, with its stipulations, is incorporated by reference as though fully restated herein.
Following the 8 June 1995 hearing, the record remained open to allow the parties to produce additional evidence. Since that time the parties submitted the depositions of Dr. James Domingue, Rick Baron, Rick Durio and Bob Fraische. In addition to the evidence accepted at the hearing, these documents are hereby made a part of the record of this case.
Based upon all of the competent evidence in the record, the Full Commission rejects the findings made by the Deputy Commissioner and makes the following:
FINDINGS OF FACT
1. At the time of the 8 June 1995 hearing, plaintiff was 33 years old, having been born 25 November 1961. Plaintiff had completed high school and two semesters at Louisiana State University. Plaintiff had worked in sales, in communication, medicine and home management; she had been an administrative assistant to an executive; and she had tried to start her own business. Plaintiff's hobbies included dancing and swimming. Plaintiff was left hand dominant. In her youth, at about twelve years old, plaintiff had received medical treatment for back problems.
2. Plaintiff had sought treatment for "insidious left sciatica" from Dr. Kenneth Rich, a neurosurgeon, in February 1989. In March, May and August 1989, plaintiff complained of low back pain or thoracic back pain or pain in her arms and shoulders. Plaintiff returned to Dr. Rich in April 1992, three years later, and reported that her husband had struck her and caused neck pain.
3. In August 1993, plaintiff began to work for defendant. Earlier this same month, plaintiff's divorce from Rick Baron became final. Mr. Baron had adopted plaintiff's teenage daughter and Mr. Baron and plaintiff had a daughter born in about 1989. Very shortly after their divorce was final, plaintiff became pregnant from Mr. Baron. The relationship of plaintiff and Mr. Baron was very stressful as a result of the divorce and the later pregnancy.
4. Defendant is in the business of selling supplies to beauty shops. Defendant is not one of the larger suppliers and relies on customer service to obtain an advantage over its larger competitors. While other suppliers ship about 95% of their supplies through the mail, defendant employer's representatives personally deliver about 60% of supplies to beauty shops. This personal delivery would require plaintiff to lift and carry supplies to beauty shops.
5. At least once per month, usually on Mondays, plaintiff would drive from Raleigh to defendant's warehouse in Greenville. Plaintiff would make this trip on Mondays because Mondays are slow days at beauty shops. At the warehouse plaintiff would load supplies into her car to take back to Raleigh to deliver to customers.
6. Plaintiff was a very good sales person. She had been a very good sales person with a previous employer where she sold mobile telephone equipment. With defendant, plaintiff was to earn a "salary" for about six months before earning strictly on commissions; however, plaintiff started earning on a commission basis after only about two months.
7. On 9 February 1994 (a Wednesday), plaintiff was six months pregnant. At this time, plaintiff returned to Raleigh from Greenville with a car loaded with supplies. She unloaded the car and carried the boxes of supplies into her home. After about one and a half hours of carrying boxes weighing up to 35 pounds, plaintiff's back began to hurt. Plaintiff testified that the pain she felt was a "sharp steady throbbing." Plaintiff testified that the pain was "very intense" and increased over the next day or two. Plaintiff reported her injury to Honeycutt on this same day, and reported to Rhett Honeycutt and Marie Rouse at Honeycutt that she had called her doctor. The Full Commission finds that this lifting of boxes up to 35 pounds, followed by sharp steady throbbing very intense pain in the back, was a specific traumatic incident.
8. Because of her pregnancy, plaintiff received regular medical treatment between October 1993 and February 1994. On 10 February 1994 (the day after the incident), plaintiff was examined at Wilkerson Obstetrics and Gynecology. At this time, plaintiff reported low back pain and was referred to the Raleigh Orthopedic Clinic.
9. Her first examination at Raleigh Orthopedic Clinic was on 15 February 1994, by Dr. James Mong. Plaintiff reported to Dr. Mong that she had experienced a five day history of upper back pain.
10. In early March 1994, plaintiff was admitted to the hospital for back pain and pre-term labor. She was treated by a number of health care providers and received medication and physical therapy. On 7 March 1994, she was examined by Dr. Daniel Albright, and plaintiff told Dr. Albright that a month earlier she was lifting boxes at work and hurt her back.
11. On 29 April 1994, plaintiff delivered a healthy baby girl. After the delivery, plaintiff suffered from post-partum depression and continued back pain. Plaintiff was referred to Raleigh Neurology, where she was examined by Dr. Michael Bowman on 9 May 1994. This was the last treatment plaintiff received for back pain before leaving North Carolina. Dr. Bowman ordered an MRI and a CT scan and he ordered EMG/nerve conduction studies. All test results were within normal limits.
12. Plaintiff was out of work in March 1994 when she was in the hospital, and she was out of work on maternity leave for six weeks after the birth of her daughter. When out of work, plaintiff continued to earn commissions from sales to her customers and continued to have back pain.
13. Plaintiff returned to work in May 1994, and although in pain from her back injury, she continued at her regular job through August 1994 because she needed the money. In July 1994, plaintiff's former husband told her that he was leaving North Carolina to return to his home in Louisiana. Plaintiff's family also lived in Louisiana. Plaintiff reported to defendant that she had to leave her job in order to return to Louisiana.
14. In July 1994 (while still employed by defendant), plaintiff contacted a cosmetics supply company in Louisiana which sold the same lines of products as defendant. Plaintiff spoke to Alexander Robert Fraische, co-owner of B D Beauty Supplies (hereinafter "B D"). Plaintiff knew that the second job would involve very similar duties to her job with defendant, and plaintiff did not represent to Mr. Fraische that she would have any physical impairments to performing the job because she needed the money. Mr. Fraische offered plaintiff the job in Louisiana.
15. In August 1994, plaintiff and her daughters returned to Louisiana. Plaintiff began to work for B D, and she remained with the company for about one month. During this time, plaintiff's back continued to give her severe pain. In the first week of October, 1994, plaintiff stopped working for B D because her back pain was so bad that she could not work.
16. On 5 October 1994, plaintiff filed a claim with the North Carolina Industrial Commission for compensation for her and her baby, stating that both had been injured at work. On the same day, plaintiff sought medical treatment at the Walk-in Clinic in Lafayette, Louisiana.
17. After leaving B D, plaintiff started her own company to perform home management services. Plaintiff had some employees, and they would perform household duties such as running errands and shopping for customers. The company failed.
18. On 8 February 1995, plaintiff returned to the Walk-in Clinic. She reported chronic pain from a work-related injury. At the clinic she was told that they could not treat her, and she was referred to a neurosurgeon. Dr. J. Robert Rivet, a neurosurgeon, examined plaintiff the next day (9 February 1995). Plaintiff reported that her primary pain was in the shoulder blades, running into her left arm. On examination of plaintiff's neck, there were "only minimal spasms perceivable." Dr. Rivet ordered repeat MRI's of the cervical and thoracic spine and myelograms/CT scan of the spine. At the time of the myelograms/CT scan and the second set of MRI's, there were no abnormalities present. Dr. Rivet referred plaintiff to Dr. James Domingue, a neurologist.
19. After 20 February 1995, Dr. Domingue became plaintiff's primary treating physician. Dr. Domingue diagnosed myofascial pain. Based on plaintiff's pain that had been present since an injury at work on 9 February 1994, it was Dr. Domingue's opinion that plaintiff was unable to be gainfully employed as of 1 October 1994 and that the cause of her inability to be gainfully employed was the incident at work on 9 February 1994. The Full Commission, based on the testimony of plaintiff and plaintiff's witnesses, including Dr. Domingue, finds as a fact that plaintiff suffered a back injury on 9 February 1994 as a result of specific traumatic incident during the course and scope of her employment with defendant employer and that she became totally disabled on 1 October 1994 as a result of such injury. Plaintiff had not reached MMI as of the date of the hearing below.
20. The Forms 22 submitted by defendant employer showed plaintiff earned average weekly wages of $583.73 for the 12 months preceding her injury, yielding a compensation rate of $389.17 per week.
* * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. Plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant on 9 February 1994, in that plaintiff sustained a specific traumatic incident of the work assigned. N.C.G.S. 97-2(6).
2. Plaintiff is entitled to payment of all medical expenses by defendant as a result of her compensable injury by accident of 9 February 1994, for so long as such examinations, evaluations, and treatments may reasonably be required to effect a cure, or give relief, and will tend to lessen plaintiff's disability. N.C.G.S. § 97-25.
3. It is well settled in North Carolina that the three-fold conditions antecedent to the right to compensation under the North Carolina Workers' Compensation Act are first, that the plaintiff suffered a personal injury by accident; second, that such injury arose in the course of the employment; and third, that such injury arose out of the employment. Wilson v. Town of Mooresville,222 N.C. 283, 22 S.E.2d 907 (1942). By amending the second sentence of Section 6 of § 97-2 to say that an accident with respect to back injuries includes an injury that is the "result of a specific traumatic incident", the General Assembly intended to relax the requirement that there be some unusual circumstance that accompanied the injury. Bradley v. E. D. Sportswear, Inc.,77 N.C. App. 450, 335 S.E.2d 52 (1985).
4. The person claiming the benefit of compensation has the burden of showing that the injury complained of resulted from an accident arising out of and in the course of employment. Henry v.A. C.Lawrence Leather Co., 231 N.C. 477, 57 S.E.2d 760 (1950). In meeting the burden of proof, the Commission is the sole judge of the credibility and weight to be given the testimony; it may accept or reject all of the testimony of a witness. Blalock v.Roberts Co., 12 N.C. App. 499, 183 S.E.2d 827 (1971).
5. The term "disability" means incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other employment. N.C. Gen. Stat. § 97-2(9). Plaintiff currently suffers total disability by reason of the injury suffered in the specific traumatic incident of 9 February 1994. The fact that plaintiff has good days as well as bad days does not make her not disabled. There was no showing by defendant that work was available to plaintiff on a "good day" basis, or whenever she felt able to do it. Also, in a commission pay situation where the employee gets commissions for phoned-in orders (not directly solicited by the employee at the time of the phone call) there is not necessarily a direct correlation between commissions earned and the ability to earn commissions. There must also be given some credit to the "sympathy factor" in the case of a commission sales person known by her customers to be suffering a disability. Sympathy sales are not good evidence of normal wage earning capacity.
6. Plaintiff's compensable injury on 9 February 1994 entitles her to disability compensation at the rate of $389.17 per week during the period of disability. Plaintiff's disability began on 1 October 1994 and continues. N.C.G.S. § 97-29.
* * * * * * * * * * *
Based on the foregoing findings of fact and conclusions of law, the Full Commission reverses the holding of the Deputy Commissioner and enters the following:
AWARD
1. Defendant shall pay all medical expenses incurred by plaintiff as a result of her compensable injury by accident of 9 February 1994, for so long as such examinations, evaluations, and treatments may reasonably be required to effect a cure, or give relief, and will tend to lessen plaintiff's disability.
2. Defendant shall pay plaintiff, on account of her total disability, compensation at the rate of $389.17 per week from 1 October 1994 until further orders of the Commission. The amount of compensation that has accrued shall be paid in one lump sum without commutation, subject to the attorney's fees hereafter awarded.
3. Pursuant to the attorney fee contract between plaintiff and her attorney, which the Commission finds to be reasonable, plaintiff's attorney shall receive 20% of the compensation awarded. Accordingly, defendants shall pay 20% of the lump sum directly to such attorney and shall pay thereafter each fifth weekly compensation check directly to such attorney. Interest on the amount due shall be paid to the plaintiff and shall run from 8 June 1995 (the date of the hearing below) on the amount due as of that date and from the due dates of the other weekly amounts until paid.
4. Defendant shall pay the costs due this Commission, including an expert witness fee in the amount of $200.00 to Dr. Domingue and the court reporting costs for all lay depositions.
 S/ ______________________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/ _______________________ COY M. VANCE COMMISSIONER
DISSENTING:
S/ _______________________ DIANNE C. SELLERS COMMISSIONER